*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-132

MARK D. GRIMES, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-8726-16)

(Hon. Marisa Demeo, Trial Judge)

(Submitted May 6, 2020                                      Decided June 24, 2021)

*Anna B. Scanlon* was on the briefs for appellant. *Sean R. Day* has since been appointed to represent him.

*Jessie K. Liu*, United States Attorney at the time the brief was filed, with whom *Elizabeth Trosman, Chrisellen R. Kolb*, *Jeffrey N. Poulin*, and *Ethan L. Carroll*, Assistant United States Attorneys, were on the brief, for appellee.

Before MCLEESE and DEAHL, *Associate Judges*, and WASHINGTON, *Senior Judge*.

DEAHL, *Associate Judge*: Police recovered a handgun from the backseat of a car in which Mark Grimes was the front-seat passenger. Following the encounter, Grimes was charged with various weapons-related offenses. The focus at trial was

whether the gun was his or, as he had posited, belonged to the driver, backseat passenger, or another individual who was not in the car but whose fingerprints—like Grimes's fingerprints—were found on the gun's magazine. The jury acquitted Grimes of charges related to possessing the gun and ammunition, but convicted him of possessing the high-capacity magazine that was found inside the gun.

Grimes appeals that conviction, raising three issues. First, he argues the government violated his Sixth Amendment right to confront the witnesses against him when it introduced a fingerprint card taken three years before this incident, in connection with an unrelated 2013 arrest. Grimes argues the fingerprint card's identification of him as the fingerprints' source was testimonial hearsay. We disagree. While it is true that the fingerprint card contained hearsay—an out-of-court statement asserting the prints belonged to Grimes and introduced to establish that fact—that hearsay statement was not made with a "primary purpose . . . to establish or prove past events potentially relevant to later criminal prosecution." *Burns v. United States*, 235 A.3d 758, 788 (D.C. 2020) (citation omitted). It is therefore not a testimonial statement subject to the Confrontation Clause's strictures. Second and relatedly, Grimes argues that even if the fingerprint card was not testimonial (as we conclude), it was nonetheless inadmissible hearsay

because it did not satisfy the business records exception to the rule against hearsay. We disagree on this point as well and conclude that it satisfied that exception.

Finally, Grimes challenges the admission of the driver's statements inviting officers to "flip the car inside out" over his hearsay objections. We agree that was error. Contrary to the trial court's ruling that this was not an "assertion of fact" but a mere "authorization" to search, the statement was an implied assertion of innocence and that was the government's stated reason for admitting it. It was made in direct response to an inquiry whether there were "any guns or drugs in the car?", and it was introduced—in the government's words—"to show . . . that [the driver] doesn't believe there's a gun in the car." That implied assertion, introduced to establish the truth of the implication that any contraband in the car did not belong to the driver, was inadmissible hearsay and it should have been precluded. Nonetheless, in light of the jury's verdict acquitting Grimes of the principal charges and the cumulative nature of this hearsay evidence, we find the error in admitting that statement harmless. We affirm.

## I.

This case began with a traffic stop. Two officers saw an SUV which they believed to be speeding, so they pulled it over. Inside the vehicle were Marcus

Wallace (driver), Mark Grimes (front-seat passenger), and Angelina Mitchell (backseat passenger, driver's side). After directing the occupants to roll down the car's heavily tinted windows, one of the officers asked Wallace if there were "any guns or drugs in the car?" Wallace said there were not and invited the officers to "flip this thing inside out" if they wanted to see for themselves. The officers took him up on the offer. While searching the back seat, officers located a black plastic bag containing men's clothing, CDs, and a .40 caliber handgun wrapped inside a shirt. The gun held a magazine containing fourteen rounds of ammunition. Following the search, the officers placed the car's three occupants under arrest.

A government forensic scientist, April Jones, checked the gun for prints. While she did not recover any from the gun itself, she lifted several from the gun's magazine. Another government employee, Laura Tierney, then compared those prints to a set of prints it had taken from Grimes in connection with an unrelated 2013 misdemeanor arrest.[1] She concluded Grimes was the source of one of the fingerprints on the firearm's magazine, while noting that an individual who was not in the car, Lamont Tucker, contributed another of the prints. Based on the

---

[1] The Metropolitan Police Department stored the prints in Live Scan, an electronic database containing arrestees' demographic information, fingerprints, and mugshots.

investigation, charges against Wallace and Mitchell were dismissed and the government indicted Grimes on five counts: (1) unlawful possession of a firearm; (2) carrying a pistol without a license; (3) possession of an unregistered firearm; (4) unlawful possession of ammunition; and (5) possession of a large capacity ammunition feeding device.[2]

Before trial, the government moved to admit the 2013 fingerprint card under the business records exception to the rule against hearsay. The card included Grimes's photo, his unique personal identification number, the name of the officer who collected the prints, and the date the prints were taken. The government explained that Officer Karen Usher, who collected the prints in 2013, was no longer employed by MPD and that it had been unable to contact her. The defense objected to the admission of Officer Usher's out-of-court statements contained on the fingerprint card, asserting that it would violate Grimes's Sixth Amendment right to confront the witnesses against him. The trial court disagreed and admitted the card into evidence. At trial—as relevant to the fingerprint evidence—the government called (1) Jones who testified that she recovered fingerprints from the firearm's magazine; (2) a custodian of records who introduced the 2013 fingerprint card,

---

[2] *See* D.C. Code § 22-4503(a)(1) (2012 Repl.), § 22-4504(a)(2), § 7-2502.01(a) (2018 Repl.), § 7-2506.01(a)(3), and § 7-2506.01(b), respectively.

explaining that he pulled it from MPD's Live Scan database; and (3) Tierney who testified that one of the fingerprints recovered from the gun's magazine matched Grimes's prints from the 2013 fingerprint card.

The jury found Grimes guilty of possessing the extended magazine while acquitting him of the remaining charges. The court sentenced him to 180 days of incarceration. Grimes now appeals his conviction.

## II.

Grimes first argues that the 2013 fingerprint card was erroneously admitted for two reasons: (A) it violated his Sixth Amendment right to confront the witnesses against him, and (B) it was inadmissible hearsay that did not satisfy the "business records" exception. We disagree with both points, which we address in turn.

## A.

We begin with the constitutional challenge to the fingerprint card's admission. The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause prohibits the government from introducing the

"testimonial" hearsay of an absent declarant at a criminal trial, absent rare exceptions inapplicable here. *Id.* at 53-54. Grimes argues the 2013 fingerprint card contained testimonial hearsay that was erroneously admitted without affording him an opportunity to confront its declarant, Officer Usher. In his view, the card contained out-of-court assertions that the fingerprints on the card "were taken from Mr. Grimes," and those assertions were testimonial. We agree with him on the first point. As the trial court acknowledged, the out-of-court notations on the fingerprint card were hearsay statements identifying Grimes—both by name and identification number—as the source of the prints on the card.[3]

---

[3] Grimes also contends the fingerprint card contained a host of other testimonial hearsay statements. For instance, he argues that the card's admission was accompanied by implied hearsay that it was "properly submitted to Live Scan with the correct identifying information." Not so. The card contained no such assertions or implied assurances, and Grimes's argument appears in actuality to be that the government lacked an adequate foundation for admitting the 2013 fingerprint card, which is exactly how his counsel described this challenge in the trial court: as a "foundational objection." Whatever merit there is to that point, it does not raise a Confrontation Clause concern. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009) ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. . . . It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live.").

The critical question is whether those statements were testimonial, an issue we review de novo. *Young v. United States*, 63 A.3d 1033, 1044 (D.C. 2013). "[T]o be testimonial, a statement must have been made, primarily, for an evidentiary purpose," *id.* at 1040—that is, it must be a "'declaration or affirmation made for the purpose of establishing or proving some fact' for use in the prosecution or investigation of a crime, or a statement made under 'circumstances objectively indicating that' the declarant's 'primary purpose was to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* at 1039-40 (first quoting *Crawford*, 541 U.S. at 51; and then quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)) (alterations omitted). "A statement made primarily for a different purpose, such as enlisting police assistance to 'meet an ongoing emergency,' is not testimonial." *Id.* at 1040 (quoting *Davis*, 547 U.S. at 822).

Grimes contends that the primary purpose of Officer Usher's attestation on the 2013 fingerprint cards was to create a record of "quintessential forensic evidence" against Grimes "to establish or prove facts potentially relevant to a later prosecution." For support, he stresses the following MPD Special Order:

> The positive identification of offenders is an essential component of the criminal justice system. Fingerprinting of persons arrested for minor charges *can lead to the clearance of warrants and unresolved cases*. Positive

> identification will also provide information that can assist
> Department and District decision-makers.

MPD Special Order SO-01-07 (Mar. 2, 2001) (emphasis added). According to Grimes, this Special Order demonstrates an awareness on the part of officers that their statements identifying an arrestee as the source of fingerprints might later be used in a criminal prosecution. The government counters that MPD takes and keeps fingerprints to serve the administrative ends of "processing and booking," such that they are not made for a prosecutorial purpose.

We have recognized that "records 'created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial'" are non-testimonial. *Bynum v. United States*, 133 A.3d 983, 986 (D.C. 2016) (quoting *Melendez-Diaz*, 557 U.S. at 324); *see also Jackson v. United States*, 924 A.2d 1016, 1021 (D.C. 2007) (court records potentially "useful in future litigation" are nonetheless non-testimonial because the "primary purpose" for their creation was to "meet" the organization's "administrative needs"). But Grimes is correct that "processing and booking" are empty descriptors that tell us nothing about the purpose for the processing and booking procedure. That fingerprinting is done as a matter of routine does not, by itself, answer the charge that the routine is carried out with a purpose to create evidence for use in trial and investigations. *See, e.g., Burns*,

235 A.3d at 790 (autopsy performed pursuant to statutory mandate was testimonial); *Bullcoming v. New Mexico*, 564 U.S. 647, 665 (2011) (forensic reports created by laboratory "required by law to assist in police investigations" testimonial).

We think both Grimes and the government paint with too broad a brush. The question before us is not a categorical one and the categorical answers on offer are ill-suited to the inquiry. As the D.C. Circuit has noted with regard to autopsy reports, "[i]t is unnecessary to decide as a categorical matter whether autopsy reports are testimonial," and "it is doubtful that such an approach would comport with Supreme Court precedent." *United States v. Moore*, 651 F.3d 30, 73 n.16 (D.C. Cir. 2011). The same is true of fingerprint cards. The question is not whether fingerprint cards are categorically created for prosecutorial purposes, but whether the objective evidence indicates this particular fingerprint card was made with an eye toward prosecution.[4] On the record before us, we think not.

---

[4] *See generally Michigan v. Bryant*, 562 U.S. 344, 360 (2011) ("[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.").

*Jackson* helps us reach that answer. 924 A.2d at 1018. That case concerned a "Notice to Return to Court." *Id.* While acknowledging that such notices "may be useful in future litigation"—they are regularly relevant in Bail Reform Act prosecutions—we nonetheless concluded it was non-testimonial. *Id.* at 1021. We explained that "the *primary* purpose" for which it was created "was not to document facts or events for future prosecution, but rather to satisfy administrative functions necessary to the operation of the court." *Id.* We further observed that such records are "regularly given to all defendants" released from custody "in the normal course of court operations for reasons other than facilitating prosecution should they subsequently fail to appear (a relatively infrequent occurrence)." *Id.*

The same analysis applies here. While fingerprint cards may occasionally prove useful in future prosecutions, it appears to be "a relatively infrequent occurrence"[5] and fingerprints are taken as a routine matter in the arrest process independent of any such purpose. *Id.* So far as this record reveals, a reasonable

---

[5] It is unusual for the government to rely on a years-old fingerprint card when it might instead take new prints from the defendant and offer a live witness to testify about them. It appears that more typical course was not taken here because the prints taken from Grimes after his 2016 arrest were lost, discarded, or corrupted (it is unclear which); the government indicated that if its motion to use the 2013 card were denied it "would have to reroll his prints and have that person testify." As for why the government did not call Officer Usher herself, it indicated that she was no longer employed by MPD and, despite some efforts, it was unable to locate her.

officer would not have understood their "primary purpose" for creating the card to be "replac[ing] live testimony in a speculative future prosecution . . . which may never occur." *Id.* at 1021. Instead, the unrefuted representations in the trial court were that these fingerprints were created "simply as part of the arrest procedures" and not "for any . . . reason other than for processing and booking."

While we have noted those are vacuous descriptors that are compatible with a prosecutorial purpose, here there is nothing more to suggest Officer Usher might have believed she was creating the fingerprint card for a predominantly prosecutorial purpose: Grimes did not contest the description that the prints were taken in the ordinary course of processing an arrestee without any particular eye toward prosecution. While the government argues that concession amounts to a waiver of the present Confrontation Clause challenge, we do not see the factual concession as a legal waiver.[6] It does, however, leave Grimes with a record devoid of any

---

[6] Defense counsel raised, and the trial court twice ruled upon, a Confrontation Clause challenge in the trial court. Even had the trial court recognized and addressed the issue on its own—without prompting from defense counsel—that would be enough to preserve the issue for appellate review. *Chatmon v. United States*, 801 A.2d 92, 100 (D.C. 2002) (error adequately preserved where "the trial judge did intervene by considering the propriety of the prosecutor's comments," despite no defense objection); *see also In re M.C.*, 8 A.3d 1215, 1223 (D.C. 2010) ("The determinative factor for purposes of preservation for appellate review is not whether counsel made every conceivable argument, but whether the trial judge was 'fairly apprised as to the question on which she was being asked to rule.'") (quoting *Hunter*

indication that the prints were taken primarily for a prosecutorial purpose, thereby leaving him with a deficiency on a factual point critical to his legal argument.

Grimes's response, relying heavily on Special Order SO-01-07, *supra*, is that a reasonable officer in Usher's shoes would have known the fingerprint card was "potentially relevant to a later criminal prosecution." Maybe so, but "the mere possibility" of use in a future prosecution does not render a record testimonial, especially where such records are used in no more than "a small fraction" of prosecutions. *United States v. Orozco-Acosta*, 607 F.3d 1156, 1163-64 (9th Cir. 2010); *see also United States v. James*, 712 F.3d 79, 97-99 (2d Cir. 2013) ("primary purpose" for creating an autopsy report was not creating "a record for use at a later criminal trial" because the medical examiner created it long before law enforcement opened an investigation into the victim's death); *State v. Jacobson*, 728 N.W.2d 613, 622-22 (Neb. 2007) (attestation that police radar was properly calibrated was not testimonial when generated "months before" the citation so that the statements were "too attenuated from the prosecution" to be testimonial). Grimes points to no case where a court has found a fingerprint card created in connection with an arrest

---

*v. United States*, 606 A.2d 139, 144 (D.C. 1992)) (alterations omitted). For the same reason, we reject the government's contention that Grimes is "estopped" from advancing a claim under the Confrontation Clause.

unrelated to the prosecution at issue was held to be testimonial. There are, however, many cases to the contrary. *See United States v. Williams*, 720 F.3d 674, 698-99 (8th Cir. 2013); *United States v. Dale*, 494 F. App'x 317, 318 (4th Cir. 2012); *United States v. Diaz-Lopez*, 403 F. App'x 199, 202 (9th Cir. 2010); *Commonwealth v. Fulgiam*, 73 N.E.3d 798, 819 (Mass. 2017); *State v. Reinhardt*, 875 N.W.2d 25, 27 (S.D. 2016); *State v. Anderson*, 687 S.E.2d 35, 38 n.3 (S.C. 2009).

Without cases directly on point, Grimes argues the Supreme Court's opinions in *Melendez-Diaz* and *Bullcoming*, along with our own recent opinion in *Burns*, support his claim. They don't. *Melendez-Diaz* held that a laboratory analyst's report identifying a seized substance as cocaine was testimonial because its "sole purpose" was to "provide prima facie evidence of the [] composition, quality, and the net weight" of the substance. 557 U.S. at 310 (emphasis omitted). Similarly, in *Bullcoming*, the Court concluded that a blood-alcohol analyst's certification prepared for the prosecution's use was testimonial. 564 U.S. at 665. In both cases, the analysts' reports were created specifically to serve as evidence in the criminal proceeding.[7] The evidence was not, as in this case, collected in connection with one

---

[7] *Melendez-Diaz* and *Bullcoming* would be on point had the government sought to admit an out-of-court expert opinion that the prints recovered from the gun matched Grimes's known prints. Such an opinion would plainly be testimonial,

crime and then used years down the road in an unrelated prosecution. Nor was it created by a non-investigating officer while booking and processing an arrestee. In both cases—and unlike the case here—the record established that, by all objective indications, the declarant's purpose was to create evidence to be used in an ongoing criminal investigation and prosecution.

Our recent opinion in *Burns* is unhelpful to Grimes for the same reasons. In *Burns*, we held that an autopsy report created in the wake of an apparent homicide and in coordination with police investigators was testimonial. 235 A.3d at 788-90. The core reasoning in *Burns* was that it was "clear from the record that the primary purpose of the autopsy . . . was to develop forensic evidence of the cause and manner of [the victim]'s death for use in the ongoing police investigation and any subsequent criminal prosecution." *Id.* at 788. It was with that factual backdrop—where the examiner had "knowledge of an active and ongoing police homicide investigation"—that we held that "any objectively reasonable forensic pathologist would have understood that the principal purpose of the autopsy and its documentation was to further the criminal investigation." *Id.* Had no criminal investigation been underway—for instance, if the autopsy had been performed at a

---

*People v. Rawlins*, 884 N.E. 2d 1019, 1033 (N.Y. 2008), but, of course, the government presented a live witness (Tierney) to offer her opinion on that matter.

time when there was no suspicion of foul play—we noted that it likely would not have been testimonial. *Id.* at 790 ("We recognize that not every autopsy conducted in the District of Columbia has as its primary purpose the creation and documentation of forensic evidence for use in a criminal investigation or prosecution.").

That is in stark contrast to this case. While Grimes's fingerprints were taken attendant to an arrest, there is no hint that identification was at issue in that 2013 misdemeanor case or—on the off-chance it was[8]—that Officer Usher was aware of it so that she might have anticipated the fingerprint card might be used in an investigation or as evidence. That is a marked difference between this fingerprint card and the chemist's report in *Melendez-Diaz*, the blood-alcohol analysis in *Bullcoming*, and the autopsy report in *Burns*. All of those reports were both facially incriminating and created in conjunction with an investigation underlying the subject prosecution. The analogy to those cases would be far closer, and we might reach a

---

[8] Grimes did not request an evidentiary hearing to probe the government's explanation that his fingerprints were taken in 2013 as a routine matter attendant to processing and booking. While "[t]he government bears the burden of establishing that a proffered out-of-court statement made by a non-testifying witness is not testimonial," *Andrade v. United States*, 106 A.3d 386, 388 (D.C. 2015), its explanations were adequate to carry that burden, at least when Grimes failed to adduce any evidence that the cards were created with an eye toward prosecution.

different conclusion, if this fingerprint card were created attendant to Grimes's arrest in this very case, or if there were otherwise some evidence that it was created for use in some criminal investigation.[9]  We do not doubt that an officer might anticipate that a fingerprint card taken in connection with one arrest could (possibly, conceivably) be used in an unrelated prosecution several years later, as occurred here.  But the chances of that are unlikely enough, and the statement identifying Grimes on the 2013 fingerprint card attenuated enough from the ultimate prosecution, that it was non-testimonial.

**B.**

---

[9] We do not suggest that a statement cannot be testimonial when used in a prosecution for an offense that occurred after the statement was made.  So long as the statement was made with an eye toward creating evidence for prosecution, we doubt it matters much if the particular offense underlying the prosecution had yet to occur.  *See State v. Jensen*, 727 N.W.2d 518, 528-29 (Wis. 2007) (victim's statements in letter and voicemail to police reporting abuse held testimonial in prosecution for victim's subsequent murder).  The Supreme Court confronted that scenario in *Giles v. California*, 554 U.S. 353 (2008), where a woman reported that her ex-boyfriend was abusing her and, weeks later, she was killed.  Prosecutors introduced her report of abuse as evidence that her ex-boyfriend had later killed her and California conceded that the report was testimonial.  *Id.* at 356-58.  The Court "accept[ed]" the concession, but did so "without deciding" the issue.  *Id.* at 358.

We turn to Grimes's related hearsay challenge to the fingerprint card. Grimes argues that the fingerprint card should not have been admitted under the business records exception to the rule against hearsay. We disagree.

Evidentiary rulings, such as a court's decisions to admit hearsay evidence, are generally reviewed by this court for an abuse of discretion. *Dutch v. United States*, 997 A.2d 685, 689 (D.C. 2010). To the extent the application of a particular hearsay exception turns on a finding of fact, "we review the finding for clear error." *Mayhand v. United States*, 127 A.3d 1198, 1205 (D.C. 2015). But "whether the trial court adhere[d] to the [appropriate] test for the admission of hearsay" under any given exception "is a legal question" that we effectively review de novo. *Id.* ("trial court abuses its discretion when it 'rests its conclusions on incorrect legal standards'") (quoting *Castillo v. United States*, 75 A.3d 157, 162 (D.C. 2013)).

Hearsay is an "out-of-court statement offered in evidence to prove the truth of the matter asserted." *Young*, 63 A.3d at 1044; *accord* Fed. R. Evid. 801(c)(2). While there is a general rule precluding the admission of hearsay, there are exceptions permitting its admission in some circumstances. *Dutch*, 997 A.2d at 688. One such exception is the business-records exception. *Id.* It applies to recorded hearsay where its proponent establishes: (1) "the record was made in the regular course of

business," (2) "it was the regular course of the business to make such records," (3) "the record was made at the time of the act, transaction, occurrence, or event, or within a reasonable time thereafter," and (4) "the original maker has personal knowledge of the information in the record or received the information from someone with such personal knowledge and who is acting in the regular course of business." *Id.* at 688-89 (citing Super. Ct. Civ. R. 43-I(a)); *see also* Fed. R. Evid. 803(6). The trial court admitted the 2013 fingerprint card under this exception, finding that it was created in the regular course of business under MPD's standard booking procedures. Because Grimes does not challenge the court's finding that each of the four criteria above were met, we do not scrutinize them. We instead limit ourselves to addressing Grimes's argument that the fingerprint card falls outside the business records exception because it "was made with an eye toward litigation."[10]

It is true that the business-records exception generally does not apply to records "made in anticipation of litigation." *Montgomery v. United States*, 517 A.2d

---

[10] Grimes also argues that the card's admission "necessarily" implied that the MPD had matched the 2013 fingerprint card to prints taken from Grimes attendant to his 2016 arrest, as had in fact happened. It did not. The government did not admit the 2016 prints taken from Grimes and nothing about the 2013 fingerprint card suggested or implied that it matched some later set of prints taken off of Grimes. *See supra* note 5. The prints MPD obtained from Grimes following his 2016 arrest were never introduced and are irrelevant to this analysis.

313, 316 (D.C. 1986); *see also Thomas v. United States*, 914 A.2d 1, 13 (D.C. 2006) ("Under the Federal Rules of Evidence . . . a record cannot qualify as a business record if it was prepared for purposes of litigation."). The problem for Grimes— mirroring the flaw with his Confrontation Clause argument—is that the record does not support his view that the fingerprint card was made with an eye toward litigation. The trial court found, based on the government's unchallenged representations, that the card was not generated for use in Grimes's 2013 prosecution or any other case; it was instead created "simply as part of the arrest procedures." While Grimes suggests that description is a fiction, if that is so, it is a fiction he did not even attempt to expose. He adduced no contrary evidence and instead left the government's representations about the ministerial nature of taking his fingerprints in 2013 uncontested.

Grimes cites no authority suggesting that fingerprint cards created as part of a routine booking process categorically fall outside of the business records exception. And, once again, there is an abundance of authority to the contrary, about both fingerprint cards and similar routine police records. *See, e.g.*, *Williams*, 720 F.3d at 698-99 ("[T]he fingerprint cards were created as part of a routine booking procedure and not in anticipation of litigation."); *Commonwealth v. Zeininger*, 947 N.E.2d 1060, 1065-68 (Mass. 2011) (breathalyzer certification and accompanying

diagnostic records, created with "two independent evidentiary purposes," are nevertheless not created in anticipation of litigation because they are "systematically" generated pursuant to statutory duty); *State v. Fitzwater*, 227 P.3d 520, 530 (Haw. 2010) (business records exception extended to speed-check cards useful in litigation, but "not created for use in a particular dispute").

Grimes further argues the business records exception does not apply to police "conjecture or conclusions" that go beyond mere observations, citing *Evans-Reid v. District of Columbia*, 930 A.2d 930, 944 (D.C. 2007). He is right about that:

> The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made "in the regular course" of the business.

*Palmer v. Hoffman*, 318 U.S. 109, 113 (1943). For that reason, documents like police reports detailing crimes fall outside of the business records exception despite the fact that they are quite routine. But the point is of no help to Grimes here. The fingerprint card contained no opinions or conclusions—only bare identifying information. It is on par with DMV records establishing an individual's license plate number or home address: it is also foreseeable that some fraction of those records will ultimately be used in a prosecution, but as with the fingerprint cards here, that

does not exempt them from the business records exception. *United States v. Childs*, 5 F.3d 1328, 1332-33 (9th Cir. 1993) (application for "license plates in the name of [defendant]" were properly admitted "as a business record"); *Bynum*, 133 A.3d at 985 n.4 (DMV records admissible under "statutory rule of evidence," *see* D.C. Code §§ 50-1218(a), 50-1301.05a(a) (2014 Repl.), "akin to exception for public records"). The trial court did not err in admitting the fingerprint card.

## III.

Grimes also challenges the admission of a statement the driver, Wallace, made to police at the scene. In response to an officer's question whether there were "any guns or drugs in the car?," Wallace said police could "flip this thing inside out." When defense counsel objected to that testimony as hearsay, the government explained that it was seeking to admit the statement "to show the state of mind of the driver, that he doesn't believe there's a gun in the car"; "this statement is just for the driver's state of mind," that he is "unaware of the fact that there's a gun in the car." The trial court admitted the statement under a different rationale, concluding it was not hearsay at all because it was "not an assertion of fact."

We agree with Grimes that the statement was hearsay because it included the implicit assertion that Wallace was not in possession of a gun in the car and it was

admitted to establish that fact. Wallace's remark does not satisfy the "state of mind" exception to the rule against hearsay, as the government argues as an alternative defense of its admission (albeit one not endorsed by the trial court). The trial court erred in permitting this testimony. Yet, for the reasons set forth below, we conclude the error was harmless.

**A.**

As defined above, hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *Young,* 63 A.3d at 1044. That definition, taken literally, supports the trial court's ruling. An invitation to "flip this thing inside out" is not an assertion of fact and, on its face, has no truth value: it is a grant of permission—a verbal act, *Medley v. United States*, 104 A.3d 115, 125-26 (D.C. 2014)—incapable of being true or false on its terms.

But that rigid approach to hearsay has long been rejected in favor of one that recognizes statements often contain implied assertions of fact and are hearsay when admitted for those implications. *See Krulewitch v. United States*, 336 U.S. 440, 442 (1949) (declarant's statement that she should "take the blame" for defendant "because he couldn't stand it" "plainly implied that [defendant] was guilty of the crime for which he was on trial" and was therefore hearsay); *Wright v. Tatham*, 112

Eng. Rep. 488, 516-17 (Exch. Ch. 1837) (letters contained hearsay admitted for "the truth of the implied statements therein contained" and "were properly rejected"). If the "declarant intends . . . to communicate an implied assertion and the proponent offers it for this intended message," the statement "falls within the hearsay definition." *United States v. Torres*, 794 F.3d 1053, 1056 (9th Cir. 2015). "In determining what is an assertion, the crucial distinction is between intentional and unintentional messages, regardless of whether they are express or implied. Nothing is an assertion unless it is intended to be one." *Martin v. United States*, 991 A.2d 791, 797 (D.C. 2010) (cleaned up).

The relevant questions when it comes to implied hearsay—which the trial court bypassed—are whether "you can flip this thing inside out" was (1) intended as an assertion of some fact and (2) admitted as proof of that implicit assertion. *See id.* ("The issue . . . turns on [the declarant's] intention when he" made the statement); *Young*, 63 A.3d at 1044 (hearsay may be "relayed explicitly or merely implied"). This statement checks both boxes.

First, the content of the exchange leaves no doubt that Wallace intended to assert a fact: that he was not in possession of guns or drugs in the car.[11]  He was, after all, responding to the question, "Do you have anything, any guns or drugs" in the car?[12]  The response of "you can flip this thing inside out" plainly translates to, "No."  If there were any lingering doubt, it appears Wallace did not leave the point to inference: he *expressly* "denied having either of those things"—guns or drugs— according to the inquiring officer's pre-trial suppression testimony.  The prosecutor similarly recounted, at that same pre-trial hearing, that Wallace "specifically" answered, "*No*, you can flip this thing inside out."  While the express part was excised from the trial testimony, Wallace's intent was apparently expressed at the scene and, at the very least, crystal clear to both the officer and the prosecutor.  *See Ryan v. Miller*, 303 F.3d 231, 249 (2d Cir. 2002) ("If the substance of the prohibited

---

[11] When assessing whether Wallace intended his statement as an assertion, it is not clear if our review is de novo or—as is typically the case for this seeming question of fact—for clear error.  We do not confront that question because on the assumption our review is for clear error, we think it clear Wallace "intended [his statement] as an assertion."  Fed. R. Evid. 801(a); *Martin*, 991 A.2d at 797.  Also, the trial court did not suggest a contrary factual finding; its conclusion that this was "not an assertion of fact" did not look behind the literal terms of the statement.

[12] The question was recounted in two ways: (1) "Is there any guns or drugs in the car?", and (2) "Do *you* have anything, any guns or drugs" in the car?  There is no material difference between the two questions for purposes of the hearsay inquiry. Either way, Wallace's response included the implied assertion that he was not in possession of any guns or drugs in the car.

testimony is evident even though it was not introduced in the prohibited form, the testimony is still inadmissible.").

Second, the statement was admitted as proof that Wallace was not in possession of a gun in the car. While the government explained its purpose for introducing the evidence was to establish that Wallace "doesn't *believe* there's a gun in the car," Wallace's belief was only relevant to the extent its premise—that he was not in possession a gun in the car—was in fact true.[13] If Wallace held a sincere but mistaken belief that he was not in possession of a gun in the car, that mistaken belief would be of no moment. Conversely, if he thought he possessed a gun in the car but was wrong, that belief too would be irrelevant. Of relevance was whether, in fact, Wallace was in possession of a gun in the car; his belief about that was relevant only

---

[13] The statement may have been admissible for the more limited purpose of demonstrating that police had consent to search the car, as the government would reasonably want the jury to know. But that was not the primary basis the government advanced for its admission. While it did suggest it could admit the statement to prove authorization to search, it also made plain its intent to use it for the implied hearsay purpose of demonstrating Wallace's innocence. If the government wanted the jury to know only that police were authorized to search, the statement could have been sanitized—a simple "the driver consented to a search" would have done the job without injecting impermissible hearsay. It also could have been accompanied by a limiting instruction cabining its probative value to the issue of consent to search. The trial court did not confront those issues because it allowed the statement to be admitted for a broader hearsay purpose at odds with those restrictions.

insofar as it was accurate.[14] The government also stressed the statement in closing as evidence of Wallace's innocence: "What did the driver do in reaction to the police and [their] concerns about what may or may not be in that car?" The statement was therefore hearsay and it was inadmissible unless it fit within some exception to the rule against hearsay.

## B.

The government contends that Wallace's statement fits within the "state of mind" exception to the rule against hearsay. We disagree. The state of mind exception, assuming it might otherwise apply here,[15] does not apply to "a statement

---

[14] It is no answer to say that Wallace's statement implied that he did not believe *anybody* possessed a gun in the car and the government was certainly not trying to establish the truth of that broader belief. Broadening the statement's implicit assertion does not change the fact that it includes the narrower one: that Wallace was not in possession of a gun. That narrower assertion was the relevant portion of the statement, and its probative force was inextricably tied to its truth. Consider if Wallace had said, in response to the question whether he had any guns or drugs in the car: "I'm not saying a word about what I do and don't have in that car, but I can tell you nobody else brought a gun in my car. Not Grimes. Not Mitchell. Nobody." The probative force of that statement would have tended to show Grimes's innocence. It was the intentional and implied assertion that Wallace was not in possession of a gun that was the raison d'être for the government introducing this statement.

[15] As we have already explained, Wallace's statement was not an explicit assertion, but a verbal act of permission that was nonetheless hearsay because it was

of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3);[16] *In re CA.S.*, 828 A.2d 184, 190 n.13 (D.C. 2003) (same). When we isolate Wallace's hearsay assertion here—"No, I am not in possession of a gun in the car"— it is an unmistakable statement of belief offered to prove the fact believed (that Wallace was not, in fact, in possession of a gun in the car). As the Federal Rules' drafters noted, admitting such statements of belief under the state of mind exception would result in "the virtual destruction of the hearsay rule." Advisory Committee's Note on Fed. R. Evid. 803(3) (1972).

The government responds that Grimes "put Wallace's state of mind at issue during his closing argument" by arguing that Wallace was "the perpetrator of [the]

---

intended as an assertion of innocence and admitted as proof of Wallace's innocence. We assume without deciding that the state of mind exception applies to statements that are not explicit but implicit assertions of the declarant's present state of mind. *Cf.* Fed. R. Evid. 801(a) (defining "statement" as "a person's oral assertion, written assertion, or non-verbal conduct, *if the person intended it as an assertion*") (emphasis added); Fed. R. Evid. 803(3) (state of mind exception applies to "[a] *statement* of the declarant's then-existing state of mind") (emphasis added).

[16] While we have never expressly adopted it, we have routinely looked to both the text and applications of Federal Rule 803(3) as persuasive authority in refining our own common law state of mind exception. *See, e.g.*, *Clark v. United States*, 412 A.2d 21, 25 (D.C. 1980). We look to that "federal rule and federal case law as persuasive authority" here. *Sims v. United States*, 213 A.3d 1260, 1266 n.9 (D.C. 2019).

offense," citing *Nelson v. United States*, 601 A.2d 582, 596 (D.C. 1991). Not so. Grimes clearly did not open the door to proof of Wallace's state of mind *during his closing argument*, as that was long after the government introduced Wallace's statement in its direct examination of its very first witness. One can hardly open a door that has already been broken down.[17] But even if Grimes had opened the door to some evidence about Wallace's state of mind, that does not answer the hearsay objection that this was not admissible evidence on the issue: "Opening the door is one thing. But what comes through the door is another." *Mercer v. United States*, 724 A.2d 1176, 1192 (D.C. 1999).

*Nelson*, the government's principal authority in support of its view that Wallace's assertion was admissible as state of mind evidence, is an instructive contrast to this case. It illustrates the difference between statements bearing on the declarant's emotional state, which fit within the state of mind exception, and those that are mere expressions of belief offered for their truth, which are not.[18] *See* Fed.

---

[17] When Grimes objected in the trial court that Wallace's state of mind was not at issue, the government did not suggest that he had—or even that he inevitably would—open the door to evidence on the issue. Grimes's opening statement did not mention Wallace or in any way suggest the gun was his.

[18] There are statements that are some combination of the two. For example, the statement "D threatened me" fits within the state of mind exception if offered to prove the declarant feared D (and it may be admitted for that purpose if declarant's

R. Evid. 803(3) (state of mind exception applies to statements of then-existing "emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief").

In *Nelson*, we approved the government playing an audiotape evincing a third party's "shock and distress when he first heard [the deceased] had been killed, which would tend to show that [the third party] was not the murderer," as the defendant had suggested. 601 A.2d at 596. But the audiotape admitted in *Nelson* seems to have contained *no statements at all*, or at least none we deemed important enough to recount in the opinion. The content of the statements (assuming there were some) was seemingly immaterial. As we described it, the audiotape was "simply a record of [the third party's] emotional response"—an "emotional outburst"—"revealing [his] shocked reaction" and "emotional distress" upon learning of the deceased's passing. *Id*. Wallace's implied assertion, by contrast, was an assertion of belief introduced for its truth. "[T]he inference that [Wallace] had an innocent state of mind . . . could be drawn by the jury only if the jury found that [Wallace's statement was] true." *United States v. West*, 877 F.3d 434, 440 (1st Cir. 2017) (state of mind

state of mind is at issue). *Clark*, 412 A.2d at 25. But it falls outside the exception if offered to prove that D did, in fact, threaten the declarant. *Id*. That would be a statement of belief offered for its truth.

exception inapplicable under that circumstance); *see also United States v. Harwood*, 998 F.2d 91, 97-98 (2d Cir. 1993) (finding declarant's state of mind "irrelevant to any issue in the case" when it was not probative "unless it was true"). *Nelson* and this case fall on polar opposite sides of the divide between statements evincing emotional states and those asserting beliefs.[19] This statement falls on the inadmissible side of that hearsay divide.

## C.

Having found error, we next ask whether the government has carried its burden of demonstrating "with fair assurance . . . that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765

---

[19] That is not the exception's only divide. The text of the federal rule juxtaposes statements of "memory or belief"—falling outside the exception's bounds—with statements of an "emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" and those of "then-existing state of mind (such as motive, intent, or plan)." Regarding that second category, "[d]eclarations of intention, casting light upon the future, [are] sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored." *Shepard v. United States*, 290 U.S. 96, 106 (1933); *Giles v. United States*, 432 A.2d 739, 745 (D.C. 1981) (same); *see also* 2 McCormick on Evidence § 276 (8th ed. 2020) ("forward-looking statements of intention are admitted while backward-looking statements of memory or belief are excluded because the former do not present the classic hearsay dangers of memory and narration").

(1946).  We think it has, for two reasons: (1) the jury's verdict acquitting Grimes of most offenses demonstrates that it was not so swayed by Wallace's protestation of innocence, and (2) the erroneously admitted statement was largely cumulative of non-hearsay evidence that Wallace was unfazed in his interactions with officers.

On the first point, Grimes was acquitted on four of the five charges, so it is clear the jury was not convinced beyond a reasonable doubt that the gun was his.  It stands to reason the jury did not put all that much stock in Wallace's self-serving proclamation that he was not in possession of any guns or drugs in the car.  That the jury found Grimes guilty of possessing the high-capacity magazine alone strongly suggests that it reached that verdict based on the fact that his fingerprints were on only the magazine.  Defense counsel invited this precise verdict when, in closing, she acknowledged: "[I]f you accept the fingerprint evidence in this case, well, then, you've got evidence that he touched a large-capacity feeding device.  You don't have any of that other proof about him loading it or handling it in any way."  The defense strategy—largely effective—was apparently to let the high-capacity magazine charge rise and fall with the strength of the fingerprint evidence while attacking the remaining charges as lacking in similarly supportive forensic evidence.  We see no reasonable likelihood that Wallace's statement affected that lone conviction given this backdrop.

Moreover, the inadmissible hearsay was largely cumulative of other evidence that Wallace was calm and unworried throughout his interactions with officers. One of the arresting officers testified that Wallace was "very compliant" and "complied with being searched" after he was asked out of the vehicle, and that evidence was admitted without objection. That supplied the government with sufficient ammunition to make its closing argument that Wallace "was open and willing to talk to the officers, and didn't seem to be under any particular stress." While the government used the inadmissible hearsay to bolster that argument, we think its incremental value was limited and, in light of the jury's ultimate verdict, that its admission was harmless.

**IV.**

The trial court's judgment is affirmed.

*So ordered*.